UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MORAN FOODS, LLC,**
*d/b/a* **SAVE-A-LOT,**

        **Plaintiff,**

  v.

**SUNSHINE STORES, LLC,** *et al.***,**

        **Defendants.**

**Civil Action 2:24-cv-4080**
**Judge Algenon L. Marbley**
**Magistrate Judge Chelsey M. Vascura**

## ORDER and REPORT AND RECOMMENDATION

Plaintiff, Moran Foods, LLC, doing business as Save-A-Lot, sues Defendants, Sunshine Stores, LLC, and Muhammed Babar Chaudhry, for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125, and Ohio law. This matter is before the undersigned for a Report and Recommendation on Plaintiff's Motion for Preliminary Injunction (ECF No. 6). After considering the testimony, evidence, and argument presented at a hearing on November 4, 2024, as well as the parties' briefs (ECF Nos. 6, 16, 18), the undersigned **RECOMMENDS** that Plaintiff's Motion for Preliminary Injunction be **GRANTED IN PART AND DENIED IN PART**.

    **I.**    **BACKGROUND**

Plaintiff is the registered owner of various trademarks. Some of these marks contain the words "Save-A-Lot," with or without hyphens (the "SAL marks"), and some instead comprise the names of several private label grocery products manufactured by Plaintiff, such as "Pickwell Farms," "Kurtz," and "Tipton Grove" (the "private label marks"). (*See* ECF No. 1-13)

(identifying Plaintiff's trademarks and registration numbers). Plaintiff's business model involves licensing the SAL marks to licensees who operate hard discount, limited assortment grocery stores under the name "Save-A-Lot." (Compl. ¶ 3, ECF No. 1.) Licensees are required to operate Save-A-Lot stores in accordance with various requirements referred to as the Save-A-Lot Program ("SAL Program"), including the purchase of private label grocery products from Plaintiff for resale to the public. (*Id.* at ¶ 4.) Between 2021 and 2023, Plaintiff entered into several License and Supply Agreements ("LSAs") with Defendants that govern the operation of over 30 Save-A-Lot stores operated by Defendants across Ohio, Indiana, and Pennsylvania. (*Id.* at ¶ 5.) The LSAs all contain the same material terms. (*See* LSAs, ECF Nos. 1-1 through 1-5.) Notably, the LSAs expressly grant Defendants a license to use the SAL marks in the operation of Save-A-Lot stores during the term of the agreements, but do not expressly mention the private label marks (although Defendants are expressly required under the LSAs to purchase Plaintiff's private label grocery products, which, in fact, bear Plaintiff's private label marks). (*See id.* at §§ 1, 5, 6(c)(iii).)

The relationship between Plaintiff and Defendants deteriorated beginning in 2023 when Defendants failed to make timely inventory payments as required by the LSAs. Plaintiff served Defendants with a notice of termination of the LSAs on May 8, 2023. (ECF No. 21-1.) The parties subsequently entered into an Interim Supply Agreement, which was amended and restated on May 19, 2023. ("ISA," ECF No. 21-2.) The ISA provided for continued purchase of inventory by Defendants from Plaintiff and stated that "the terms of the [LSAs] shall remain unchanged and in full force and effect." (*Id.* at § 3.) Plaintiff alleges that Defendants again failed to make all necessary payments under the ISA and served Defendants with a notice of termination of the ISA

2

on October 9, 2024. (ECF No. 21-3.) Defendants served Plaintiff with a reciprocal notice of termination of the ISA on October 9, 2024. (ECF No. 21-4.)

Plaintiff further alleges that on October 9, 2024, Defendants began the process of "de-branding" the Save-A-Lot stores governed by the LSAs and operating those same stores under the name "Value Foods Market." (Compl., ¶ 54, ECF No. 1.) Plaintiff presented evidence at the November 4, 2024 hearing that, at four stores operated by Defendants in Columbus, Ohio, Defendants had put up a "Value Foods Market" banner outside the stores, but continued to use the SAL marks throughout the stores on shopping carts, lane dividers, reusable shopping bags, point of sale ("POS") systems, and card readers as recently as November 3, 2024. (*See* Dwayne Test. and photographs at Plaintiff's Exhibit H.)

Plaintiff commenced this action on October 17, 2024, advancing claims for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 and 1125, Ohio common law trademark infringement, Ohio common law unfair competition, and violation of Ohio's Deceptive Trade Practices Act, O.R.C. § 4165.02. (Compl., ECF No. 1.) Plaintiff also filed a Motion for Preliminary Injunction seeking to enjoin Defendants "and all persons acting in concert with them from directly or indirectly:

1. infringing SAL's intellectual property, including but not limited to its trademarks, trade dress, trade name, and logos;

2. using, promoting, marketing, or advertising SAL's trademarks in connection with any Store that is no longer being operated as a SAL-branded store; and

3. continuing any and all of the acts of unfair competition and unfair business practices alleged herein."

(Pl.'s Mot. for Prelim. Inj. 1, ECF No. 6.)

During the hearing, Defendants agreed to promptly complete de-branding of the stores governed by the LSAs and argued that they should be afforded a reasonable 30-day period from

3

the onset of de-branding (i.e., until November 9, 2024) to complete the process. Plaintiff agreed to the 30-day de-branding period, and the parties reached agreement during a hearing recess on most aspects of Defendants' operation of the stores that Plaintiff considered to be infringing. The parties have since submitted a proposed agreed injunction, which Judge Marbley has approved and entered on the docket. (ECF No. 25.) That agreed injunction requires Defendants to refrain from using or displaying the SAL marks and logos anywhere in their grocery stores. (*Id.*)

The sole remaining area of disagreement relates to Defendants' intention to continue selling their remaining inventory of Plaintiff's private label products under the banner of Value Foods Market. On this point, Plaintiff specifically requested that Defendants be enjoined from selling any of the private label products and that such goods be donated to local food banks or discarded. Defendants did not agree to stop selling its remaining inventory of Plaintiff's private label products and did not agree to donate or discard the products.

## II. STANDARD OF REVIEW

When deciding whether to grant a preliminary injunction, courts must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021). Although courts "sometimes describe this inquiry as a balancing test," the irreparable harm factor is "indispensable." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). That is, "the existence of an irreparable injury is mandatory" before a preliminary injunction may be issued. *Id.* at 327. That said, in actions such as this involving trademark infringement or unfair competition under the Lanham Act, a plaintiff who establishes a likelihood of success on the merits is entitled to a rebuttable presumption of irreparable harm. *See* 15 U.S.C. § 1116(a).

4

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

The Court must first consider whether Plaintiff has established a strong likelihood of success on the merits of its claims. All five of Plaintiff's claims involve the same analysis. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996) (claims under §§ 1114 and 1125 of the Lanham Act are evaluated under the same standard); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) (trademark claims under Ohio common law follow the same analysis as those under the Lanham Act); *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1431 (S.D. Ohio 1990) (claims under Ohio's Deceptive Trade Practices Act implicate the same analysis as those under the Lanham Act).

A claim for trademark infringement under the Lanham Act (and, as a result, each of Plaintiff's other claims) requires a showing (1) of ownership of a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) that there is a likelihood of consumer confusion. *Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 749 (S.D. Ohio 2010). The parties do not dispute that Plaintiff is the registered owner of both the SAL marks and the private label marks, which are valid and protectable. Nor do the parties dispute that Defendants have used the SAL marks and private label marks in commerce by continuing to sell Plaintiff's private label products following the termination of the LSAs and ISA (i.e., without Plaintiff's consent). (*See* LSAs § 6(c)(iii), ECF Nos. 1-1 through 1-5) ("Upon the . . . termination of this Agreement, Licensee shall immediately . . . [c]ease use of, by advertising or any manner whatsoever, the [SAL] Marks . . ."). The only point of contention is whether Plaintiff has shown a likelihood of customer confusion as a result of Defendants' continued sale of the private label products.

1. **Private Label Products Bearing SAL Marks**

The private label products fall into two categories: (1) those that bear both private label marks, such as "Pickwell Farms," "Kurtz," and "Tipton Grove," *and* SAL marks, such as the "Save-A-Lot" logo"; and (2) those that bear only private label marks. Products bearing the SAL marks provide an easy answer to the confusion question: "proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'" *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997). *See also Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 649 (6th Cir. 1982) ("the past association of the Ohio Elby's restaurants with the Big Boy trademark through their expired licensing agreement with Frisch's increases the likelihood that consumers would be confused about whether the Ohio Elby's restaurants continued to be linked with the Big Boy organization"). Because Plaintiff provided Defendants with a license to use the SAL marks only during the terms of the LSAs and ISA, and because those agreements are no longer in effect, Defendants' continued sale of the private label products bearing the SAL marks falls squarely within the holding of *U.S. Structures*.[1]

---

[1] Plaintiff contends that the Court should evaluate the likelihood of confusion using the eight factors set forth in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982) (adopting the eight-factor test established in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)). But that eight-factor test "was developed for a different problem—i.e., for analyzing whether two competing brands' marks are sufficiently similar to cause consumer confusion" as to the origin of particular goods. *See Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936 (9th Cir. 2015) (discussing same *Sleekcraft* factors adopted by the Sixth Circuit in *Frisch*); *see also Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, 568 (2000) (applying the eight-factor test to determine confusion as to origin of goods); *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) (same); *cf. Interactive Prod. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 696 (6th Cir. 2003) (declining to use the eight-factor test because Defendant's use of Plaintiff's mark did not identify the source of Defendant's goods). The eight-factor test is therefore of limited utility here, where there are no competing marks in use and all goods in question genuinely originated with Plaintiff.

Defendants urge the Court to instead apply the "first sale" or "exhaustion" doctrine, which states that "resale by the first purchaser of the original trademarked item is generally neither trademark infringement nor unfair competition." *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 369 (6th Cir. 2007). The doctrine "applies when a purchaser does no more than stock, display, and resell a producer's product under the producer's trademark." *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 257 (6th Cir. 2003) (abrogated on other grounds) (cleaned up); *see also Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 766 (6th Cir. 2005) ("when a retailer merely resells a genuine, unaltered good under the trademark of the producer, the use of the producer's trademark by the reseller will not deceive or confuse the public as to the nature, qualities, and origin of the good"); *Too, Inc. v. TJX Companies, Inc.*, 229 F. Supp. 2d 825, 833 (S.D. Ohio 2002) (no trademark violation when a defendant sells genuine goods bearing the plaintiff's mark, even when the sales are made without the plaintiff's authorization). But the first sale doctrine does not apply when the seller of the producer's goods is a former licensee. *See Oneida Consumer, LLC v. Fox*, No. 2:20-CV-2043, 2020 WL 4582704, at *6 (S.D. Ohio Aug. 10, 2020) (collecting cases). The doctrine "is premised on the first sale being authorized by the trademark owner." *Id.* (citing *Microban Prod. Co. v. API Indus., Inc.*, No. 14 CIV. 41 KPF, 2014 WL 1856471, at *9–10 (S.D.N.Y. May 8, 2014). And "if the license prohibits a post-expiration selling of inventory by the licensee, then it cannot be said that the first sale was authorized by the trademark owner." *Id.* (citing *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 155 (3d Cir. 1984) and *Starin Mktg., Inc. v. Swift Distrib., Inc.*, No. 2:16-CV-67, 2018 WL 6659620, at *4 (N.D. Ind. Oct. 31, 2018)). The first sale doctrine also "offers no defense when the reseller used the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees." *PACCAR*, 319 F.3d at

7

257. Given that Defendants are former licensees, and that post-license sale of Plaintiff's private label products establishes a likelihood of customer confusion, the first sale doctrine does not prevent a finding of infringement as to private label products bearing the SAL marks.

Defendants also rely on § 5(d) of the LSAs, which states that title to the private label products passes to Defendants on delivery. Defendants argue that title to the products enables them to continue selling the products in Value Foods Market stores. But this argument ignores the difference between ownership of a product and permission to use a trademark. Further, another provision of the LSAs states: "in the event Licensee does not promptly and fully 'de-brand' the Stores . . ., Licensee hereby grants Licensor the right following termination of the license . . . to enter the Premises and remove any . . . items bearing the [SAL] Marks, and in such event, Licensee does hereby transfer, assign, and quitclaim any and all right, title and interest in and to such . . . items bearing the [SAL] Marks . . ." (*See* LSAs § 6(c)(iv), ECF Nos. 1-1 through 1-5.) Thus, any title to the products bearing the SAL marks was forfeited when the LSAs and ISA were terminated.

In sum, Defendants' continued sale of Plaintiff's private label products bearing the SAL marks following the termination of the LSAs and ISA establishes a likelihood of customer confusion, and it is therefore sufficient to establish a likelihood of success on the merits as to Plaintiff's request to enjoin Defendants from continuing to sell Plaintiff's private label products bearing the SAL marks.

### 2. Private Label Products Bearing Only Private Label Marks

The result is different for private label products bearing only private label marks without an accompanying "Save-A-Lot" logo. Because the private label marks were not addressed by the LSAs or the ISA, Defendants are not former licensees with respect to the private label marks and the holding of *U.S. Structures* does not apply. Instead, it is appropriate to apply the first sale

8

doctrine to Defendants' sale of Plaintiff's private label products that bear only private label marks. The parties have agreed that Defendants will imminently complete de-branding of their stores; thus, Plaintiff has offered no evidence that Defendants will "use[ ] the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees." *See PACCAR*, 319 F.3d at 257. Rather, at that point, Defendants will do "no more than stock, display, and resell a producer's product under the producer's trademark." *See id*. Accordingly, Plaintiff has not established a likelihood of confusion, or a likelihood of success on the merits, as to the private label products that do not bear the SAL marks.

Plaintiff argues that the first sale doctrine is inapplicable because the first sale of the private label products by Plaintiff to Defendants was not authorized, owing to Defendants' failure to make payments for the products. (Pl.'s Reply 6, ECF No. 18.) But Plaintiff cites no authority for its contention that failure to timely make payment renders a sale of goods, which Plaintiff voluntarily shipped to Defendants, despite Defendants' substantial history of late payments, "unauthorized" for the purpose of the first sale doctrine.[2] Defendants' failure to pay may give rise to a claim for breach of contract, but Plaintiff has not supported its argument that such actions control its trademark claims. The same is true of Plaintiff's argument that the LSAs and ISA permit Defendants to sell Plaintiff's private label products only in accordance with the SAL Program: this is an argument for breach of contract, not trademark infringement. As Plaintiff has no contract claims before this Court, these arguments do not establish a likelihood of success on the merits.

---

[2] Defendants also dispute Plaintiff's allegation that Defendants have not paid for the private label products. (*See* Reciprocal Termination Notice, ECF No. 21-4) (requesting return of Defendants' "excess funds on deposit with" Plaintiff).

9

B.  **Irreparable Harm**

As discussed above, when a plaintiff establishes a likelihood of confusion as part of a trademark or unfair competition claim under the Lanham Act, that plaintiff is entitled to a presumption of irreparable harm. *See* 15 U.S.C. § 1116(a). Irreparable harm is thus presumed as to Defendants' continued sale of private label products bearing the SAL marks. Defendants have offered no evidence or argument to rebut that presumption, and the presumption favors issuing an injunction.

Plaintiffs are not, however, entitled to a presumption of irreparable harm from Defendants' sale of private label products that do not bear the SAL marks. Nor have Plaintiffs offered evidence of irreparable harm from the continued sale of these products. (*See* Pl.'s Mot. for Prelim. Inj. 13, ECF No. 13) (arguing only that Plaintiff has a substantial financial interest in the exclusive use of its "licensing program" as demonstrated by the LSAs—but the LSAs govern licensing only of the SAL marks). As a finding of irreparable harm is "mandatory" before a preliminary injunction may issue, the Court need not analyze any other injunction factors with regard to Defendants' continued sale of private label products bearing only the private label marks. *See D.T.*, 942 F.3d at 327.

C.  **Balance of Harms and Public Interest**

Should an injunction not issue as to the private label products bearing the SAL marks, Plaintiff has shown that it is likely to be harmed via customer confusion under *U.S. Structures*. On the other hand, Defendants contend that an injunction would entail the loss of $2.5 million's worth of private label products sourced from Plaintiff (out of Defendants' total inventory worth $8.5 million), which would cause such financial harm that Defendants would have to close their business operations and waste Defendants' multi-million dollar grocery inventory. (Hood Aff. ¶ 26, ECF No. 21.) But any injunction would apply only to those private label products bearing

10

SAL marks. At the hearing, all parties represented that they did not know how many of the private label products in Defendants' inventory bear SAL marks. The parties, therefore, have offered no evidence as to the value of the products that would be affected by the injunction. In any case, harm to an infringer as a result of complying with an injunction prohibiting infringement is "hardly a legally cognizable" harm. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006).

Defendants also argue that an injunction would harm the public. According to Defendants' brief, the stores at issue are largely located in areas underserved by other grocers, such that an inability by Defendants to sell the private label products would prevent the public from purchasing inexpensive foodstuffs. (Defs.' Mem. in Opp'n 7, ECF No. 16.) Defendants offer no evidence in support of this assertion. And as Plaintiff points out on reply, there appear to be other low-cost grocery stores with range of many of Defendants' stores. (Pl.'s Reply 9, ECF No. 18.) The public interest is also generally served by injunctions protecting trademark rights and protecting customers from being misled. *See Lorrillard Tobacco*, 453 F.3d at 383.

The undersigned therefore finds that the balance of harms and the public interest favor issuing the preliminary injunction with regard to private label products bearing the SAL marks.

## IV. DISPOSITION

For these reasons, it is **RECOMMENDED** that Plaintiff's Motion for Preliminary Injunction (ECF No. 6) be **GRANTED IN PART and DENIED IN PART**. Specifically, it is **RECOMMENDED** that Defendants be **ENJOINED**, during the pendency of this litigation, from continuing to sell Plaintiff's private label products bearing SAL Marks.

Further, Plaintiff is required by the Federal Rules of Civil Procedure to "give[ ] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" in connection with the injunction. Fed. R.

11

Civ. P. 65(c). The parties have not briefed the appropriate amount of the security, and the parties were unsure at the hearing as to the value of Defendants' inventory that would be affected by the injunction. Accordingly, as part of their responses or objections to this Report and Recommendation, the parties are **ORDERED** to brief the issue of the appropriate amount of the security under Rule 65(c).

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE