UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MORAN FOODS, LLC,

    Plaintiff,

    v.

SUNSHINE STORES, LLC, et al.,

    Defendants.

Case No. 2:24-cv-4080

JUDGE DOUGLAS R. COLE
Magistrate Judge Vascura

## OPINION AND ORDER

This case asks what seems, at first glance, an easy question: A licensee acts as a reseller for a licensor's trademarked goods. If the licensor terminates the license, does the licensee's continued sale of previously acquired inventory constitute trademark infringement? While the question is easy to pose, it turns out answering it is more difficult on the facts here than one might imagine. Yet, that is the question the Court must answer to determine whether a preliminary injunction is warranted. The matter is currently before the Court on consideration of the parties' objections (Docs. 31, 32) to the Magistrate Judge's November 13, 2024, Order and Report and Recommendation (R&R, Doc. 27) granting in part Plaintiff's Motion for Preliminary Injunction (Doc. 6). For the reasons below, the Court **OVERRULES** Plaintiff's Objections (Doc. 32) and **SUSTAINS** Defendants' Objections (Doc. 31). Accordingly, the Court **ADOPTS IN PART** the Magistrate Judge's R&R (Doc. 27).

## BACKGROUND

Plaintiff Moran Foods, LLC, is the registered owner of various trademarks. Some of these marks contain the words "Save-A-Lot," with or without hyphens (the

"SAL marks"). Others instead comprise the names of several private-label grocery products that Moran manufactures. This latter group includes marks such as "Pickwell Farms," "Kurtz," and "Tipton Grove" (the "private-label marks"). (*See* Doc. 1, #12–18; Doc. 1-13).

Moran's business model involves licensing one or more of the SAL marks (more on that below) to licensees who operate hard-discount, limited-assortment grocery stores under the name "Save-A-Lot." (Doc. 1, #1–2). Licensees are required to operate Save-A-Lot stores in accordance with various requirements referred to as the Save-A-Lot Program ("SAL Program"). (*Id.* at #2). These include, for example, using various signage that incorporate Save-A-Lot marks. (*See id.*). One other requirement is that the licensees purchase private-label grocery products from Moran for resale to the public in their stores. (*Id.*). Sometimes those private-label grocery products bear only private-label marks, and sometimes they bear private-label marks and also a small Save-A-Lot logo, which is one of the SAL marks that Moran owns. (*See* Doc. 27, #1348).

Between 2021 and 2023, Moran entered into several License and Supply Agreements ("LSAs") with Defendants Sunshine Stores, LLC, and its owner (and sole member) Muhammad Chaudhry. (Doc. 1, #6–7). These LSAs govern the operation of over thirty Save-A-Lot stores Defendants operate across Ohio, Indiana, and Pennsylvania. (*Id.* at #2). The LSAs all contain the same material terms. (*See* LSAs, Docs. 1-1, 1-2, 1-3, 1-4, 1-5). Notably, the LSAs expressly grant Defendants a license "to use the mark SAVE-A-LOT and such other marks as the parties may agree to in

2

writing from time to time" in the operation of Save-A-Lot stores during the term of the agreements. (*See e.g.*, Doc. 1-1, #29). While the license provision does not expressly mention the private-label marks, the LSAs containing that provision expressly require Defendants to purchase Moran's private-label grocery products, which bear Moran's private-label marks. (*See e.g.*, *id.* at #35–38).

Moran's relationship with Defendants began deteriorating in 2023 when Defendants failed to make timely inventory payments that the LSAs required. As a result, Moran served Defendants with a notice of termination of the LSAs on May 8, 2023. (Doc. 21-1). The parties subsequently entered into an Interim Supply Agreement ("ISA"), which was amended and restated on May 19, 2023. (Doc. 21-2). The ISA provided that Defendants would continue to purchase inventory from Moran and stated that "the terms of the [LSAs] shall remain unchanged and in full force and effect." (*Id.* at #989). Moran alleges that Defendants again failed to make all necessary payments under the ISA, so it served Defendants with a notice of termination of the ISA on October 9, 2024. (Doc. 21-3). Defendants served Moran with a reciprocal notice of termination of the ISA on the same day. (Doc. 21-4).

Moran further alleges that on October 9, 2024, Defendants began the process of "debranding" the Save-A-Lot stores governed by the LSAs (e.g., by removing the Save-A-Lot signage) and, instead, started operating those same stores under the name "Value Foods Market." (Doc. 1 #10). But that switchover led to something of a mishmash, at least initially. Moran presented evidence at the November 4, 2024, hearing that, at four of the stores Defendants were operating in Columbus, Ohio,

3

Defendants had put up a "Value Foods Market" banner outside the stores, but, as recently as November 3, 2024, (i.e., the day before the hearing), had continued to use the SAL marks throughout the stores on shopping carts, lane dividers, reusable shopping bags, point of sale systems, and card readers. (*See* Doc. 1, #11; Doc. 1-8).

Moran sued on October 17, 2024, advancing claims for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 and 1125; trademark infringement and unfair competition under Ohio common law; and violations of Ohio's Deceptive Trade Practices Act, Ohio Revised Code § 4165.02. (Doc. 1, #19–23). Plaintiff also filed a Motion for Preliminary Injunction seeking the following:

> [A] preliminary injunction enjoining and restraining Defendants … and all persons acting in concert with them from directly or indirectly:
>
> 1. infringing SAL's intellectual property, including but not limited to its trademarks, trade dress, trade name, and logos;
>
> 2. using, promoting, marketing, or advertising SAL's trademarks in connection with any Store that is no longer being operated as a SAL-branded store; and
>
> 3. continuing any and all of the acts of unfair competition and unfair business practices alleged herein.

(Doc. 6, #750).

During the Preliminary Injunction Hearing before the Magistrate Judge, Defendants agreed to promptly complete debranding of the stores governed by the LSAs. But they argued that they should be afforded a 30-day period from the onset of debranding (i.e., which had started on October 9, 2024, when the parties mutually terminated the ISA) to complete the process. Moran agreed to the 30-day debranding

4

period (which would expire November 8, 2024). And the parties agreed during a hearing recess on most aspects of Defendants' operation of the stores that Moran considered to be infringing. (Doc. 27, #1345–46).

The parties submitted a Stipulated Preliminary Injunction (the "Injunction") on November 8, 2024, which this Court (through the then-assigned judge) approved and entered on the docket. (Doc. 25). The Injunction requires Defendants to refrain from using or displaying the SAL marks and logos anywhere in their grocery stores but "does not prevent Defendants from selling other grocery products provided by SAL that may bear the [SAL marks]." (*Id.* at #1337). That said, the Injunction required Defendants to immediately stop selling *expired* groceries associated with the SAL marks at issue, including the private-label products provided by Moran. (*Id.*). Additionally, Defendants were required to "permit [Moran's] employees to cooperatively audit Defendants' compliance … by allowing them to walk through Defendants' stores beginning November 10, 2024." (*Id.*).[1]

On November 11, 2024, Plaintiff filed an Emergency Motion for Contempt and Sanctions with respect to Defendants' failure to comply with the Injunction enjoining Defendants from unlawfully using the SAL marks. (Doc. 23). Moran reported that their independent audit of the stores revealed several instances of noncompliance with the Injunction. (Doc. 23-1). Moran requested that this Court order Defendants to: (1) immediately cease operation of stores for at least fourteen days, and

---

[1] There were a few other aspects of the Injunction: (1) that Defendants remove any online association between Defendants' Value Foods Market and Moran, and (2) Moran unlock Defendants' point of sale machines so Defendants may remove references to the marks. (Doc. 27, #1337–38).

5

(2) reimburse Moran for fees and costs incurred. (*Id.* at #1005). The Court found the first part of Moran's request overbroad and premature, as the request came only a week after the Preliminary Injunction Hearing, and only four days after the parties submitted the Injunction to the Court. (Doc. 26, #1341). But the Court strongly cautioned Defendants that it would consider ceasing Defendants' store operations and impose a fine for any further noncompliance with the Injunction. (*Id.* at #1341–42).

Then, on November 13, 2024, the Magistrate Judge entered an Order and Report and Recommendation addressing the remaining issues from the Motion for Preliminary Injunction. (Doc. 27). Specifically, the R&R indicates there is one such issue: whether Defendants may continue selling their remaining inventory of Moran's private-label products under the banner of Value Foods Market. (*Id.* at #1346). In answering that question, the Magistrate Judge divided the private-label goods into two categories—(1) those bearing both a private-label mark and a Save-A-Lot mark, and (2) those bearing solely a private-label mark. (*Id.* at #1348). The R&R then recommended that the Court grant in part Moran's Motion for Preliminary Injunction. (*Id.* at #1348–54). Specifically, the Magistrate Judge recommended that the Court enjoin Defendants from selling any private-label products that bear *both* private-label marks and Save-A-Lot marks (the first category above). (*Id.* at #1353–54). By contrast, for private-label products that bear *only* private-label marks (the second category), the Magistrate Judge recommended denying Moran's request. (*See*

6

*id.*). The Magistrate Judge then ordered the parties to brief the issue of the appropriate amount of the security, which Rule 65(c) requires. (*Id.* at #1354).

The R&R drew the line between the two categories of products due to a limitation that the Magistrate Judge found in the first sale doctrine in the context of former licensees. The R&R recognized that, as a general matter, the first sale doctrine provides that, "resale by the first purchaser of the original trademarked item is generally neither trademark infringement nor unfair competition." (*Id.* at #1349, (quoting *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 369 (6th Cir. 2007))). So, if "a purchaser does no more than stock, display, and resell a producer's product under the producer's trademark," that is not infringement. (*Id.* (quoting *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 257 (6th Cir. 2003))).

But the R&R found that the first sale doctrine plays out differently as to former licensees. This was true, the R&R said, in two ways. First, the first sale doctrine turns on the initial sale "being authorized by the trademark owner." (*Id.* (quoting *Oneida Consumer, LLC v. Fox*, No. 2:20-cv-2043, 2020 WL 4582704, at *6 (S.D. Ohio Aug. 10, 2020))). And "if the license prohibits a post-expiration selling of inventory by the licensee, then it cannot be said that the first sale was authorized by the trademark owner." (*Id.* (quoting *Oneida Consumer*, 2020 WL 4582704, at *6). Second, the R&R determined that the first sale doctrine "offers no defense when the reseller used the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees." (*Id.* at #1349–50 (quoting *PACCAR*, 319 F.3d at 257)). To the contrary, "proof of continued,

7

unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'" (*Id.* at #1348 (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997))).

In the context of the facts here, the R&R found that the (now-terminated) LSAs licensed the SAL marks. So, under the former-licensee framework described above, the first sale doctrine would not apply to products bearing any SAL mark, in turn meaning that Moran had a high likelihood of success on the merits as to its trademark claims based on those products. (*Id.* at #1348–50). As to the purely private-label products, though, (i.e., those without an SAL mark), as to which Defendants were not former licensees, the first sale doctrine governed, meaning that Moran did not have a high likelihood of success. (*Id.* at #1350–51).

The parties have each objected to the R&R and included briefing on the bond issue in those filings. (Docs. 31, 32). The parties also responded to the other's objections. (Docs. 33, 34).

## LEGAL STANDARD

When reviewing a party's objections to an R&R on a motion for injunctive relief, a district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."). Upon review, the district judge "may accept, reject, or modify,

in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed R. Civ. P. 72(b)(3).

In determining whether a preliminary injunction is warranted, the Court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012). While a strong likelihood of success is the crucial factor, all four must be balanced rather than treated as prerequisites. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

## LAW AND ANALYSIS

This Court first addresses the objections about Moran's likelihood of success on the merits. Then the Court turns to the Rule 65(c) issue regarding the appropriate amount of the bond.

### A.     Moran's Objections

Moran objects to the Magistrate Judge's recommendation that the Court refrain from enjoining Defendants from selling private-label products that lack SAL marks. (Doc. 32, #1404–09). In particular, Moran argues that the Magistrate Judge should not have applied the first sale doctrine for two reasons: (1) the sale was not authorized, and (2) the products sold were materially different from Moran's products. (*Id.*).

9

1.   **Moran Approved the Initial Sales—So They Were Authorized Sales.**

As the R&R correctly recognized, the first sale doctrine "is premised on the first sale being authorized by the trademark owner." *Oneida Consumer*, 2020 WL 4582704, at *6 (citing *Microban Prod. Co. v. API Indus., Inc.*, No. 14 Civ. 41, 2014 WL 1856471, at *9–10 (S.D.N.Y. May 8, 2014)). And it further addressed Moran's argument that its first sale of its private-label products to Defendants was unauthorized because of Defendants' non-payment for those products and failure to follow the SAL program. (Doc. 27, #1351). The Magistrate Judge found this argument unpersuasive since Moran voluntarily shipped the goods to Defendants, despite Defendants' substantial history of late payments. (*Id.*). She also noted that Moran failed to cite any authority for the proposition that a failure to pay renders a first sale unauthorized—while Moran's argument may have played better in a breach-of-contract context, it did not work in the trademark-infringement context. (*Id.*).

In objecting to this finding, Moran argues that the non-compete provision in its LSAs prohibits the sale of "any products" for twelve months after termination. (Doc. 32, #1405). So, Moran says, any sale of private-label goods in a competing store after the agreement's termination was unauthorized. (*Id.*; *see, e.g.*, Doc. 1-3, #142). Moran maintains that since it terminated the ISA (which incorporates the LSAs' terms) in October 2024, this non-compete provision is in place until at least October 2025. (Doc. 32. #1403–04; *see* Doc. 1-3, #142 (explaining that Defendants cannot "own, maintain, engage in, or have an interest in the operation" of a competing store for twelve months after the agreement's termination)). At bottom, Moran essentially

10

argues that the non-compete provision in incompatible with authorization, which Defendants have the burden of showing. (Doc. 32, #1405–07).

In focusing on whether the first sale was authorized, Moran starts on strong footing. "Courts in the Sixth Circuit are in agreement with the Second Circuit" that "[i]f the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.'" *FURminator, Inc. v. Kirk Weaver Enters.*, 545 F. Supp. 2d 685, 690 (N.D. Ohio 2008) (quoting *Ryan v. Volpone Stamp Co.,* 107 F. Supp. 2d 369, 382 (S.D.N.Y. 2000)). But that principle offers Moran little support here. After all, Moran did approve of the first *sale*; it simply did not approve of Defendants failure *to pay* for the products. That failure to pay may give rise to a breach of contract claim, which would be remedied by damages, but not to a trademark claim. The same is largely true of the non-compete provision—violating it may be a breach of contract, but it is not a trademark violation.

Moran argues otherwise, pointing to *Ryan v. Volpone Stamp Co.*, a case involving a terminated licensee. There, a former Major League Baseball player sued a former licensee for its continued manufacture, sale, distribution, and marketing of memorabilia after the termination of the parties' licensing agreement. 107 F. Supp. 2d at 373–75. The player, in moving to preliminarily enjoin the licensee from continuing to produce and sell the memorabilia, argued that the licensee's actions constituted trademark infringement because consumers would be confused about whether Ryan continued to associate with or approve of the products. *Id.* at 379. The

11

licensee, for its part, argued that even if the licensing agreements were properly terminated, it had produced the goods at issue before the agreement terminated. *Id.* The court agreed with the player that he stated a viable Lanham Act claim. *Id.* at 386. And, in coming to that conclusion, it noted that "if a licensee could sell inventory manufactured during the term of the license over an indefinite period after its termination or expiration, the expiration date would have little force or meaning." *Id.* at 385.

At first blush then, *Ryan* seems to help Moran. But *Ryan* turned on the fact that the defendant there was a former licensee. And that is problematic for Moran because the Magistrate Judge found—and Moran did not object—that Defendants are not former licensees with respect to the private-label products that lack SAL marks. (Doc. 27, #1350). That finding was not clearly erroneous, and thus absent objection, it stands. And that brings this case within the general rule under which "[i]t does not matter that the owner of the trademark objects to the use of its mark, as long as one *approved* sale has already occurred." *McDonald's Corp. v. Shop at Home, Inc.*, 82 F. Supp. 2d 801, 807 (M.D. Tenn. 2000). Here, one has. So the Court overrules Moran's objection directed at whether the sale was authorized.

### 2. Moran's Materially-Different-Products Objection Ignores the Stipulated Injunction.

Moran separately objects that the first sale doctrine does not apply because the private-label products Defendants sell are materially different "from genuine Save-A-Lot private-label products." (Doc. 32, #1409). That argument again starts from a position of strength; a common exception to the first sale doctrine is "'when an alleged

12

infringer sells trademarked goods that are *materially different* than those sold by the trademark owner.'" *Brilliance Audio*, 474 F.3d at 370 (quoting *Davidoff & CIE, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1302 (11th Cir. 2001)). This exception is designed to avoid consumer confusion and the dilution of a trademark's value. *Id.* For instance, if a product is sold under the same guise as another, but its quality is worse, that would harm the mark.

But while the legal premise Moran offers is sound, its application on the facts here is not. The principal way in which Moran contends Defendants' goods are "materially different" is that the foodstuffs are past their expiration date, and thus of lower quality. (Doc. 32, #1408–09). True, failure to adhere to a trademark's quality control requirements can constitute a material difference. *FURminator, Inc.,* 545 F. Supp. 2d at 690. But the argument simply ignores the parties' agreement after the Preliminary Injunction Hearing. As part of the Stipulated Preliminary Injunction, Defendants were required to "immediately cease selling any expired groceries associated with the [SAL marks], including private-label products provided by [Moran], in Defendants' stores." (Doc. 25, #1337). This Court approved this Injunction and entered it on the record. (*Id.* at #1338). Indeed, the Court has *enforced* the requirement that Defendant cease selling expired private-label goods after Moran's Emergency Motion for Contempt and Sanction (Doc. 23). (Docs. 26, 30). So Moran cannot point to such no-longer-ongoing sales as evidence of a "material difference."

Accordingly, the Court **OVERRULES** Moran's Objections (Doc. 32).

13

**B.     Defendants' Objections**

Defendants object to the Magistrate Judge's recommendation that they should be enjoined from selling the private-label products with SAL marks. (Doc. 31, #1395–99). Defendants' objections turn on whether the LSAs cover the SAL mark used on some of the private-label goods. According to Defendants, the R&R erred in concluding that the LSAs covered that mark. (*Id.* at #1395–96). And that also means, they say, that the terminated-licensee exception to the first sale doctrine does not apply, and that they are entitled to sell the private-label products. (*See id.* at #1398–99).

**1.     The LSAs Grant a License in Only One Mark.**

Defendants argue that the provision in the LSAs that grants a trademark license refers to "the mark SAVE-A-LOT and such other marks as the parties may agree in writing to from time to time." (*Id.* at #1395; *see also, e.g.*, Doc. 1-3, #129). According to Defendants "the mark SAVE-A-LOT" in the license, (Doc. 1-3, #129), refers to "the singular 'SAVE-A-LOT' mark," which is U.S. Trademark Reg. No. 1,210,074, (Doc. 31, #1395–96). That mark, Defendants say, is different from the separately registered "Save A Lot" logo mark (U.S. Trademark Reg. No. 5,822,845) that is included on the private-label goods. (*Id.*). And based on that premise, they urge the Court to apply the same analysis to the products with SAL marks that the Magistrate Judge applied to the private-label products bearing only the private-label marks. (*Id.* at #1396).

14

In response, Moran presses two arguments, one procedural and one substantive. As to the former, it contends that this argument was not presented to the Magistrate Judge, so the Court should not consider it now. (Doc. 34, #1419). Meanwhile on the substance Moran offers one sentence. Specifically, Moran claims that, even if the Court were to consider Defendants' argument, the LSAs "clearly cover [both] the 'SAVE A LOT' marks and the 'SAVE A LOT' stylized logos," (the latter of which are the marks on the goods) as evidenced by "the contractual language and the parties' conduct." (*Id.* at #1419–20).

Start with the procedural argument. To Moran's credit, a party may be procedurally barred from raising a new argument in objections to an R&R. *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) (noting that a failure to raise a claim before the magistrate judge constitutes forfeiture). But in Defendants' initial opposition to Moran's Motion for Preliminary Injunction, they argued that the license in the LSAs did not cover private-label products such as "Pickwell Farms, Kurtz, etc." because "the LSAs make specific reference only to the Save A Lot mark and while they discuss the potential use of 'such other marks as the parties may agree to in writing' no other agreements exist." (Doc. 16, #936). The Court finds that this sufficiently raises the issue of the limited scope of the trademark license for the Court to consider it now. Accordingly, the Court will make a de novo determination on whether the Grant of Nonexclusive License also includes the Save-A-Lot marks that appear on the private-label products. *See* 28 U.S.C. § 636(b)(1); *see also* Fed R. Civ. P. 72(b)(3).

15

On that issue, the R&R implicitly found that the SAL marks on the products were included in the Grant of Nonexclusive License under the LSAs, which are now terminated. The Court, however, disagrees. A couple of different provisions in the LSAs inform that conclusion. Start with the LSAs' Background section, which provides as follows:

> A. Licensor is the owner of certain trademarks, service marks, logos, trade names, slogans and other distinctive identifies of source, registered and unregistered, for use in connection with the operation of retail grocery stores and related products and services, including, but not limited to, the marks "SAVE-A-LOT" (U.S. Trademark Reg. No. 1,210,074), "SAVE A LOT" (U.S. Trademark Reg. No. 2,522,594), "SAVE A LOT" (U.S. Trademark Reg. No. 2,813,215), "SAVE A LOT" (U.S. Trademark Reg. No. 3,193,809) and "SAVE A LOT" (U.S. Trademark Reg. No. 5,822,845).
>
> …
>
> E. Pursuant to that certain Asset Purchase Agreement dated May 7, 2021, by and among the Parties (the "APA"), Licensee has, among other things, acquired the rights to operate the Stores. Subject to the terms and conditions set forth herein, Licensee desires to obtain a license to use certain of Licensor's marks in connection with the operation of the Stores, which the Parties intend to be a hard discount, limited assortment grocery store under the Program at the Location (as defined herein) and Licensee desires to purchase Inventory from Licensor in connection therewith.

(Doc. 1-3, #128). In other words, the LSA expressly acknowledges that Moran Foods owns multiple related, but distinctly registered, trademarks. And it further acknowledges that the Licensee will obtain a license in "certain" of those marks in connection with "the *operation* of the Stores." (*Id.* (emphasis added)). So which mark or marks do the LSAs license? That is the subject of paragraph 1 of the "Terms" in the Agreement, which provides:

16

> 1. Grant of Nonexclusive License. Licensor grants Licensee, and Licensee accepts, a nonexclusive, revocable, non-transferable, non-assignable, non-sublicensable license during the term of this Agreement to use the mark SAVE-A-LOT and such other marks as the parties may agree to in writing from time to time (collectively, the "Marks") to operate hard discount, limited assortment grocery stores (the "Stores" or, individually, a "Store") at the locations identified in Exhibit A, as amended from time to time consistent with this Agreement (the "Premises" or, singularly, each "Location") upon the terms and subject to the provisions of this Agreement, including the Program Standards, as defined herein, and all other documents relating hereto.

(*Id.* at #129). In other words, the license provision: (1) initially grants a license in a single mark ("the mark"); (2) identifies that mark as "SAVE-A-LOT" (with hyphens); and (3) provides that the license will extend to such other marks "as the parties may agree to in writing." (*See id.*). As to that third point, no one has suggested that there was any additional writing covering any additional marks here.

What to make of that? Well if, as the plain language says, the license grants rights in a single mark, and that mark is a mark with hyphens, then the only mark that the License identifies that fits the bill would be the "SAVE-A-LOT" mark registered under U.S. Trademark Reg. No. 1,210,074. (Doc. 31, #1396). And, as noted, all agree that there was no later writing adding any additional marks to the license. So, based on that plain language, the Court concludes that Moran has not shown a strong likelihood of success in arguing that the LSAs grant a license in every trademark identified in Paragraph A of the Background section.

That, in turn, means that Moran cannot rely on the terminated-licensee exception either to overcome the first sale doctrine, or to show a likelihood of confusion more broadly. Stated differently, the Sixth Circuit's holding that, "proof of continued, unauthorized use of an original trademark by one whose license to use the

17

trademark had been terminated is sufficient to establish 'likelihood of confusion,'" *U.S. Structures, Inc*, 130 F.3d at 1190, on which the R&R relies, simply does not apply here. Instead, as the Magistrate Judge correctly explained with respect to the private-label products not bearing a Save-A-Lot logo:

> The parties have agreed that Defendants will imminently complete de-branding of their stores; thus, Plaintiff has offered no evidence that Defendants will "use[] the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees." *See PACCAR*, 319 F.3d at 257. Rather, at that point, Defendants will do "no more than stock, display, and resell a producer's product under the producer's trademark." *See id.*

(Doc. 27, #1351). So too for the SAL products.[2]

Accordingly, Moran has not established a likelihood of confusion, or a likelihood of success on the merits, as to any of the private-label products, whether they include an SAL mark or not. Defendants' objection is therefore **SUSTAINED**.

## C.   Bond

Finally, Defendants request that the Court order a bond under Rule 65(c). The rule states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper

---

[2] Further, even if the terminated-licensee framework applied, the Court is not convinced it cashes out the way that the R&R (and Moran) suggests. The original cases on which that exception rests, *Ryan*, *Blass*, and *U.S. Structures*, involved licensees who were *manufacturing* products pursuant to a license. These licensees argued that they should be free to sell any inventory that they had manufactured pre-termination, on the grounds that the units were *manufactured* with authorization, and thus fell within the first sale doctrine. *See Ryan*, 107 F. Supp. 2d at 373–75; *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 153–54 (3d Cir. 1984); *U.S. Structures*, 130 F.3d at 1187–88. Of course, in such situations, unlike here, there was no "first sale" to the manufacturer from the trademark holder. Here, by contrast, there is. Thus, the first sale doctrine may play out differently. Given the Court's finding that the LSAs do not grant a license in the SAL mark at issue here, however, the Court need not, and thus does not, reach the question of how the first sale doctrine would have applied if Defendants were in fact a former licensee as to the relevant mark.

to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538–39 (6th Cir. 1978) (noting the bond requirement is discretionary, but the district court must expressly consider the question).

Moran maintains that Defendants have agreed that Moran is not required to post a bond pursuant to the License & Supply Agreements. (Doc. 32, #1403–04; Doc. 34, #1423–25). Defendants argue that the provision Moran relies on is the "Restricted Group and Non-Compete" which pertains to a one-year noncompete restriction that has expired. (Doc. 33, #1412). They also complain that the provision is directed toward injunctions relating to noncompete violations—a form of relief that Moran neither requested in its motion nor sought during the hearing. (*Id.* at #1414).

The Court, however, finds it need not resolve this dispute. As already noted, the Court finds that Moran does not have a strong likelihood of success on the merits as to either the purely private-label goods or the private-label goods that also bear a SAL mark, so the Court declines to issue an injunction as to any of those goods. With that, the issue of bond is moot.

## CONCLUSION

For the reasons above, the Court **OVERRULES** Moran's Objections to the Magistrate Judge's November 13, 2024, Report and Recommendation (Doc. 32) and **SUSTAINS** Defendants' Objections (Doc. 31). The Court further **ADOPTS IN PART** the Magistrate Judge's R&R (Doc. 27). Specifically, the Court adopts the R&R's finding that Moran has not established a strong likelihood of success on the merits

19

for its claims as to the sale of private-label products without SAL marks. The Court further finds the same for private-label products with the Save A Lot mark registered under U.S. Trademark Reg. No. 5,822,845. The Stipulated Preliminary Injunction (Doc. 25) remains in full force and effect.

    **SO ORDERED.**

June 26, 2025
 **DATE**

                                        **DOUGLAS R. COLE**
                                        **UNITED STATES DISTRICT JUDGE**